UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID M. COOK,

                 Plaintiff,                           Case No. 08-13404

vs .                                      DISTRICT JUDGE GERALD E. ROSEN
                                            MAGISTRATE JUDGE STEVEN D. PEPE

COMMISSIONER OF
SOCIAL SECURITY,

                 Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.**      **BACKGROUND**

Plaintiff brought this action under 42 U.S.C. § 405(g) and § 1383(c)(3) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits ("DIB") and Supplement Security Income ("SSI") under Title II and XVI of the Social Security Act. Both parties have filed motions for summary judgment, with Plaintiff proceeding *pro se*, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED** and Defendant's motion for summary judgment be **GRANTED**.

     **A.**      **Procedural History**

Plaintiff applied for DIB on July 20, 2005, and SSI on October 27, 2005, alleging that he had been disabled since February 1, 1998. After Plaintiff's DIB claim was initially denied on

1

October 24, 2005 (R. 16), a hearing was held on July 10, 2007 before Administrative Law Judge

Donald G. D'Amato ("ALJ") (R. 284-335).  Plaintiff was represented by attorney Clifford B.

Walkon.  Vocational Expert Luann Castellana ("VE") also testified (R. 328-334).

 In a December 17, 2007, decision, ALJ D'Amato concluded that Plaintiff was not under a

disability as defined by the Act through March 31, 2002, the date last insured, and denied

Plaintiff's DIB claim.  Yet, the ALJ found that Plaintiff was under a disability beginning on July

20, 2005, and approved Plaintiff's SSI claim (R. 16-27).  On June 10, 2008, the Appeals Council

denied Plaintiff's request for review, thus making it the final decision of the Commissioner (R.

5-8).

 **B.** **Background Facts**

  **1.** ***Plaintiff's Hearing Testimony***

 Plaintiff was 52 years old at the time of the hearing (R. 288), and lived with a friend (R.

320).  He is able to drive, but did not at the time of the hearing because his license had been

suspended for an unpaid ticket (R. 318).

 Plaintiff spends a typical day watching T.V., and sometimes playing games on the

computer (R. 316).  He does chores around the house, such as washing dishes, vacuuming,

laundry, and goes grocery shopping once a month (R. 320-321).

 Plaintiff states the last time he worked was in November of 1997 stocking shelves at

Wal-Mart (R. 324).  He was let go from that job because he was unable to complete his tasks in a

timely manner (R. 325).  Prior to that, Plaintiff worked a number of jobs, most of which involved

repairing machinery (R. 321-324).

 When he was 13 years old Plaintiff had an accident involving a sewer pipe that left him

in a coma (R. 293).  He spent approximately 25 days in the hospital, and then was housebound until the following January, eight months after the accident.  He suffered headaches that kept him in bed, and took Darvon for the pain (R. 294).

When he was 18 years old, Plaintiff began to abuse alcohol and drugs (R. 319).  He stated that the alcohol and marijuana use were his way of self-medicating to relieve his pain, but he stopped using them in 1988 and remained clean for eight years (R. 295).  He stated he no longer drinks alcohol, but has smoked marijuana ten to twelve times since 1998, with the last being in March of 2007 (R. 295-296, 319).

Plaintiff testified that beginning in 1993 or 1994, he suffered anxiety-related migraine headaches, which were brought on by the stress of taking care of his brother (R. 298).  Dr. Michael Hackett treated him for these headaches with Imitrex shots, until Plaintiff's brother passed away in 1995 or 1996, which relieved Plaintiff of the anxiety (R. 298-299, 303-304, 307). By 1998 he was having headaches two or three times a week, and they could last a few days at a time (R. 305).  Because of the headaches, he has trouble sleeping (R. 320).  He was prescribed Xanax, which takes the level of pain from a six or eight on a scale of ten down to about two or three, which allows him to sleep through the night (R. 297, 306, 315, 326-327).

Plaintiff stated that he experienced short blackouts and memory loss due to epilepsy beginning in 1991 or 1992 (R. 299).  In May of 2007, Plaintiff was admitted to the hospital due to a scabies infestation, and was given Dilantin intravenously to treat his epilepsy (R. 311). Plaintiff also testified that he experiences shaking in his right arm and right leg two or three times a day (R. 301, 310).  He takes Neurontin, which eliminated the burning sensation he experienced, but it has not stopped the shaking.

3

2.      *__Medical Evidence__*

Plaintiff's 1969 accident involved head injuries when a large sewer pipe rolled over him (R. 253).  There are no medical records for this period, but in a letter dated November 3, 1998, Thomas B. Ducker, M.D. confirmed that he treated Plaintiff for his injuries (R. 181).  Dr. Ducker indicated that Plaintiff was in a coma, and was successfully treated without surgery, but did require medications, including medication for seizures.

On July 21, 1992, Plaintiff sought emergency room care complaining of a severe headache (R. 122).  He was diagnosed with acute post-traumatic cephalalgia by Michael May, M.D., and reported feeling much better after being given Compazine (R. 123).

On February 5, 1994, Plaintiff returned to the emergency room seeking treatment for a headache that was more severe than usual (R. 128).  He reported that he usually got headaches every two or three months and normally treated them with Clonopin, which had been prescribed for his wife.  On this occasion, the Clonopin did not help with the pain, so he took Deseryl, which had been prescribed for his brother.  Wanda Ramsey, M.D., examined Plaintiff and noted that a head CT scan was done and came back negative.  Dr. Ramsey treated Plaintiff with Compazine, which "significantly" helped his headache, and gave him a prescription for Fiorinal.

On November 10, 1994, Plaintiff again sought emergency room care complaining of chest pains and headache (R. 139).  E.M. Glorioso, M.D., noted that all of Plaintiff's objective test results were normal.  Dr. Glorioso treated Plaintiff with medication, and diagnosed acute non-specific chest pains and acute migraine headache.  Plaintiff was discharged with a prescription for Tylenol #3.

On February 18, 1998, Plaintiff received emergency room care to treat a sore throat with

4

accompanying head and nasal congestion (R. 155).  He received prescriptions for Ery-Tab and Nasacort, and was discharged in good condition.

On September 15, 1998, Plaintiff began seeing Fouad Batah, M.D., to treat anxiety and muscle spasms, and was prescribed Xanax and Buspar (R. 167).  Treatment notes indicate that Plaintiff saw Dr. Batah a number of times between September 15, 1998, and August 1, 2005 (R. 157-166).  During that period, Plaintiff was treated for migraine headaches, in addition to anxiety and muscle spasms.

On February 6, 2000, Plaintiff was treated at Oakwood Hospital for wrist and forearm pain as well as abrasions suffered when he attempted to jump into a moving vehicle (R. 190-195).  On September 1, and again on October 31, 2005, Plaintiff received emergency services at Oakwood Hospital for headaches (R. 182-189).  Both times he was given a prescription for Xanax and discharged.

On October 14, 2005, Edward A. Czarnecki, Ph.D., a state agency psychologist, undertook to complete a Psychiatric Review Technique Form ("PRTF"), but determined there was insufficient evidence to make a medical disposition determination (R. 205-218).

On January 25, 2006, Plaintiff saw Brian Zink, M.D. (R. 238-240).  Plaintiff reported that "over the past couple months" his headaches had increased (R. 239).  Plaintiff reported a history of "seizure-like" activity, described as a bad headache and "clenching of his fingers and flexion of fingers and wrists on both hands."  Plaintiff reported that he was awake during those periods and could communicate with others, and the symptoms improved when he took Xanax (R. 240).  A head CT scan was negative, and Dr. Zink did not feel that there was "any evidence of seizure disorder at [that] time" and diagnosed acute and chronic headaches (R. 239).

5

On March 31, 2006, Plaintiff saw Darin Zahuranec, M.D., and reported that, after he recovered from his accident, he had rather severe headaches for approximately two years (R. 233). Plaintiff stated that his headaches had worsened since 1992, and they were currently so severe that he was unable to move or speak when he was having one. He said the headaches occur seven or eight times per month and can last up to three days. Dr. Zahuranec also noted that Plaintiff experienced diffusely brisk reflexes and spasticity in his extremities, as well as paresthesias and tingling on his right thigh in the lateral aspect, and occasionally the left thigh (R. 235-236). Plaintiff also reported "spells" that he knew were not epilepsy, but resulted in hand trembling, followed by flexion of both upper extremities (R. 234). These "spells" are triggered by heat, and Plaintiff attributed them to a scar on his spinal cord. Plaintiff also reported occasional feelings of depression, but had not received treatment for it or any other psychiatric illness. Dr. Zahuranec noted that although Plaintiff's "spells" were not due to epilepsy, Plaintiff was at risk for epileptic seizures (R. 236). Dr. Zahuranec recommended a trial of Pamelor and Midrin to treat Plaintiff's headaches (R. 236-237).

On April 4, 2006, Dr. Zahuranec noted that Plaintiff stated he could not afford the Pamelor and Midrin (R. 231). A one-time prescription for Xanax was approved, but with no refills, as it was not a typical treatment for headaches.

On May 1, 2006, Plaintiff underwent a four-hour EEG (R. 241-244). It showed significant interictal epileptic form abnormalities with multiple episodes of dependent spike-and-wave discharges with a frontal predominance and independent bi-temporal slowing (R. 242-243). The report indicated that the abnormal EEG suggested the presence of partial onset seizures and focal neuronal dysfunction. On May 11, 2006, Plaintiff underwent an MRI scan of the brain and

6

cervical spine (R. 245).  The report indicated that the scan of the brain was essentially

unremarkable, and the scan of the spine revealed some straightening of the spine, but no

significant cord compression or foraminal stenosis.  On June 9, 2006, Dr. Zahuranec reviewed

the EEG and MRI results and recommended treatment with topiramate (R. 227-228).

On June 30, 2006, Plaintiff saw Dr. Zahuranec and reported no change in his symptoms

(R. 223-226).  Dr. Zahuranec started Plaintiff on Topamax (R. 225).  On September 19, 2006,

Plaintiff returned to Dr. Zahuranec reporting significant side effects on Topamax, including

painful paresthesias in all four extremities (R. 220).  Dr. Zahuranec offered a trial of Depakote,

which Plaintiff refused due to potential side effects (R. 221).  Dr. Zahuranec started Plaintiff on a

trial of Neurontin, and also prescribed indomethacin.

On May 22, 2007, Plaintiff was admitted to Oakwood Southshore Medical Center for

generalized rashes on his legs, arms, and face (R. 257-261).  While there, Ram S. Garg, M.D.,

noted that Plaintiff's Dilantin level was low, so his dose was increased (R. 264-265).  Plaintiff

was discharged on May 31, 2007, in stable condition (R. 255).

On September 8, 2007, at the ALJ's request, Plaintiff underwent a psychiatric evaluation

performed by M. Bhavsar, M.D., a state agency psychiatrist (R. 266-272).  Dr. Bhavsar noted

that Plaintiff was in touch with reality and was not responding to internal stimuli (R. 267).

Plaintiff's self-esteem was low, and he displayed psychomotor agitation, but he tended to

exaggerate his symptoms.  Plaintiff denied visual and auditory hallucinations, command

hallucinations, delusions of control, persecutory delusions, ideas of reference, thought insertion

or broadcasting, obsessions, suicidal and homicidal ideation or plans, feeling helpless, hopeless,

and worthless.  Dr. Bhavsar noted that Plaintiff's mood was depressed, and his affect was

7

constricted.  Plaintiff was alert and oriented to person, place, and time.  Plaintiff's immediate and recent memory were deficient, as he was able to repeat six numbers forward, but only three of six backward with errors, and he was only able to recall two of three objects after three minutes. Plaintiff's information, calculation, abstract thinking, similarities and differences, and judgment abilities were adequate (R. 267-268).  Dr. Bhavsar diagnosed Plaintiff with mood disorder and anxiety disorder due to head injury, personality disorder, and headaches and seizure disorder. He determined his Global Assessment of Functioning ("GAF") score as 60[1], and his prognosis was fair (R. 268).

Dr. Bhavsar also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) (R. 269-271).  Dr. Bhavsar noted that because Plaintiff experienced racing thoughts, had difficulty in focusing, and had trouble remembering, he was moderately limited in his ability to understand and remember complex instructions, carry out complex instructions and make judgments on complex work-related decisions (R. 269).  Dr. Bhavsar also noted that because of Plaintiff's racing thoughts and frequent headaches, he had moderate limitations in his ability to interact appropriately with the public, supervisors, and co-workers, and to respond appropriately to usual work situations and to changes in a routine work setting (R. 270).

On September 8, 2007, Plaintiff also underwent a psychological consultation performed by Julia A. Czarnecki, M.A., L.L.P., a state agency psychologist (R. 273-280).  Ms. Czarnecki

---

[1] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning."  AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed. 1994) at 30.  It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self of others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *See id.* at 32.  A GAF score of 51-60 is indicative of "[m]oderate symptoms or any moderate difficulty in social, occupational, or school functioning."  *Id.*

noted that Plaintiff arrived on-time for the appointment, but was disheveled in appearance and was poorly groomed (R. 275).  Plaintiff had a red and swollen rash on his right arm and complained of severe itching, but had not sought treatment for it.  His speech was clear, but slowly produced, and he was loud and abrasive during the interview, but was not directly rude to the examiner.  Plaintiff was verbose and sometimes needed to be refocused, and he was highly anxious and mildly agitated, but cooperated during the exam.  Ms. Czarnecki stated that Plaintiff was preoccupied and restless, but he did not present as psychotic or paranoid, and denied any symptoms of disturbance of thought.  He denied feeling suicidal or depressed, but admitted to feeling "nervous a lot."

Ms. Czarnecki noted that Plaintiff's performance on the Wechsler Adult Intelligence Scale ("WAIS-III") placed him at the lower range of low average intellectual functioning (R. 276).  Yet, Plaintiff achieved scores in the mild impaired range on working memory tasks and processing speed skills, and scored very poorly on questions addressing social norms and expectations.  Plaintiff's results on the Bender-Gestalt Test were also poorly reproduced, and included several significant errors and rotations suggestive of an organic brain disorder affecting visual spatial reasoning.  Ms. Czarnecki stated that Plaintiff's processing speed and short term recall skills were at least mildly impaired, and that he could read at the low high school level, which was consistent with his vocabulary skills.  Ms. Czarnecki diagnosed Plaintiff with a mood disorder NOS and polysubstance abuse in remission, and assessed his GAF score as 60, and gave him a guarded prognosis, based on medical condition.

Ms. Czarnecki also completed a  Medical Source Statement of Ability to Do Work-Related Activities (Mental) (R. 277-279).  She noted that Plaintiff had a mild limitation in his

9

ability to make judgments on simple work-related decisions, and moderate limitations in his

ability to carry out complex instructions, make judgements on complex work-related decisions,

and respond appropriately to usual work situations and to changes in a routine work setting.

Additionally, Ms. Czarnecki noted that Plaintiff had a marked limitation in his ability to make

judgments on complex work-related decisions.

### *Evidence Submitted After the December 17, 2007 Decision*[2]

Plaintiff submitted evidence to be considered by this Court as part of his motion for

summary judgment (Dkt. #24), and again in his brief in support of his motion (Dkt. #31).  The

evidence consists of medical records from William Beaumont Hospital and Henry Ford Hospital,

and an affidavit from Kathleen Sapikowski, Plaintiff's sister.

Between November 24, 1970, and April 24, 1973, Plaintiff underwent three operations to

repair damage to his ears (Dkt. #24, pp. 27-40).  The operations were performed at William

Beaumont Hospital by Dr. Wendling.

On April 23, 2008, Plaintiff underwent a neuropsychological assessment at Henry Ford

Hospital performed by Brad Merker, Ph.D., a staff neuropsychologist (Dkt. #24, pp. 23-26).

Plaintiff reported that he had seizures ever since his accident as a teenager, and he currently

experiences three different types of seizures (Dkt. #24, p. 23).  Plaintiff also reported significant

---

[2] Because this evidence was not before the ALJ when he rendered the final decision of
the Commissioner, it cannot be considered for substantial evidence review.  *See Wyatt v. Sec'y of
Health and Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992).  The only purpose for which this
Court can consider this additional evidence is to determine whether this case should be remanded
to the agency pursuant to the sixth sentence of 42 U.S.C. § 405(g).  *Cotton v. Sullivan*, 2 F.3d
692, 695-96 (6th Cir. 1993).  This Court may remand the case if the additional evidence is new
and material, and if there was good cause for failure to incorporate the additional evidence into
the record at a prior hearing.  42 U.S.C. § 405(g) (sentence six); *See Wyatt*, 974 F.2d at 685;
*Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).

memory problems, difficulties with attention and concentration, and severe headaches.  Dr.
Merker noted that Plaintiff's past psychiatric history was significant for inpatient substance
abuse treatment (Dkt. #24, p. 24).  Dr. Merker's impression based on the test results as that
Plaintiff's overall intellectual function was in the average range, and that he demonstrated
relatively intact abilities in the areas of visual-spatial ability and language functioning (Dkt. #24,
p. 25).  Yet, Plaintiff demonstrated weaknesses on measures assessing visual immediate memory,
figural fluency and information processing speed.  In addition, Plaintiff demonstrated impaired
performance on a measure of retention for unrelated pairs of words.  Dr. Merker noted that
Plaintiff's profile was not definitively suggestive of a localized or lateralized pattern of deficits,
but that Plaintiff's poor performance in measures of figural fluency and visual immediate
memory suggested the possibility of a right frontal temporal seizure focus.  Dr. Merker stated
that Plaintiff may benefit from participating in an epilepsy support group and undergoing
WADA testing, and that he is a surgical candidate (Dkt. #24, pp. 25-26).

On June 14, 2008, Plaintiff underwent a brain MRI at Henry Ford Hospital (Dkt. #31, p.
6).  Eric Spickler, M.D., interpreted the results and noted that, other than minimal callosal
dysgenesis, the study was unremarkable.

On April 16, 2009, in a sworn statement, Plaintiff's sister, Kathleen Sapikowski,
recounted Plaintiff's accident and recovery process (Dkt. #24, pp. 6-7).  She averred that
Plaintiff was unable to hold down a job for any length of time, and that he has had problems with
balance and sight for over 35 years.

### 3.   *Vocational Evidence*

VE Castellana characterized Plaintiff's past work as a maintenance mechanic as a skilled

occupation performed at a medium exertion level; past work as a maintenance supervisor as skilled with light exertion; past work as a stock worker as unskilled at a medium exertion level; past work as a sales floor associate as semiskilled at a light exertion level; and past work as a building maintenance worker as skilled with medium exertion (R. 330). The skills Plaintiff acquired from his maintenance background were "significant," but were "pretty much job-specific."

ALJ D'Amato first asked VE Castellana to consider an individual of Plaintiff's age, education, and past work experience who would require work which is simple/unskilled with the following limitations: no more than three-step instructions; occasionally work in close proximity to co-workers, meaning that the individual could occasionally function as a member of a team, and occasionally be in direct contact with the public; the option to sit or stand at will, meaning the individual could perform his duties in either position; no working around moving machinery or unprotected heights; and no temperature extremes and stable humidity. Also, the individual would be able to perform the following postural activities occasionally: climbing stairs with handrails, but never ladders, scaffolds, or ropes; balancing, stooping, crouching, kneeling, and crawling (R. 331). VE Castellana testified that this hypothetical person would not be able to perform any of Plaintiff's past relevant work. The ALJ then asked the VE if there were other jobs in the regional or national economy that the hypothetical individual could perform (R. 332). The VE testified that this individual would be able to perform some unskilled jobs at the light or sedentary level such as assembling, inspecting or checking/sorting, and packaging. In total, there are about 8,000 of these jobs in the southeast Michigan region (R. 332-333).

ALJ D'Amato then asked VE Castellana to consider the same hypothetical individual

12

from the first question with the added limitation that the individual would require, in addition to

any regularly scheduled breaks, to be off-task at least one hour per eight-hour day due to the

symptomatology of his impairments and/or the ancillary effects of treatment for such

impairments (R. 333).  The VE testified that there would be no jobs in the regional or national

economy that this individual could perform.

ALJ D'Amato then asked the VE to consider the same individual in the first question, but

the individual would also miss greater than two work days a month due to the symptomatology

of his impairments and/or the ancillary effects of treatment for such impairments.  VE Castellana

again testified that there would be no work such individual could perform.

Finally, ALJ D'Amato asked the VE if a hypothetical individual who was mentally

and/or cognitively unable to sustain concentration, persistence and pace necessary to consistently

work for eight hours per day, five days a week, in order to fulfill a 40-hour workweek (R. 334).

VE Castellana testified that there would be no jobs in the regional or national economy such

individual would be capable of performing.

### 4.    *The ALJ's Decision*

ALJ D'Amato found that Plaintiff last met the insured status requirements of the Social

Security Act on March 31, 2002, and had not engaged in substantial gainful activity since

February 1, 1998, the alleged onset date (R. 19).  Plaintiff's diagnosed mood disorder, NOS,

anxiety disorder, personality disorder, NOS, seizure disorder, and migraines secondary to a head

injury qualified as severe impairments.  Yet, the impairments did not meet or equal the

requirements of any impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§

404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (the "Listing").  ALJ

D'Amato concluded that Plaintiff had not been under a "disability" within the meaning of the Act at any time from the alleged onset date through July 20, 2005 (R. 26).

ALJ D'Amato evaluated the functional limitations resulting from Plaintiff's impairments, as required by C.F.R. §§ 404.1529 and 416.929 (R. 20-21). The ALJ found that prior to July 20, 2005, Plaintiff retained the residual functional capacity ("RFC") to perform work which was simple, unskilled, with one, two, or three step instructions; occasionally in close proximity to co-workers (meaning that he could occasionally function as a member of a team), and occasionally in direct contact with the public; he could lift or carry 10 pounds frequently and 20 pounds occasionally; he would require a sit/stand option while remaining at the workstation (option means that he would be able to sit or stand at will while performing his assigned duties); he could stand/walk (with normal breaks) for a total of six hours in an eight-hour workday; he could sit (with normal breaks) for a total of two hours in an eight-hour workday; he could perform pushing and pulling motions with his upper and lower extremities within the aforementioned weight restrictions; he should avoid unprotected heights and moving machinery; he was restricted to a work environment with stable temperatures; and he could perform each of the following postural activities occasionally: climbing stairs with handrails, but never ladders, scaffolds, or ropes; balancing; stooping; crouching; kneeling; and crawling (R. 19-20).  In so finding, the ALJ noted that the medical evidence was "very intermittent," and that there was no mention of a seizure disorder and no prescription for anti-seizure medication between February 1, 1998, the alleged onset date, and March 31, 2002, the date last insured (R. 21).  The only impairments documented during that period were migraine headaches, anxiety and polysubstance abuse in recent remission in February 1998.  Additionally, the ALJ noted that Plaintiff was able

14

to work for a number of years, doing work of a skilled or semi-skilled nature.  Based on the

evidence of record for this period, the ALJ found that although Plaintiff's medically

determinable impairments could reasonably be expected to produce the alleged symptoms,

Plaintiff's statements concerning the intensity, persistence and limiting effects of these

symptoms were not entirely credible prior to July 20, 2005 (R. 22).

ALJ D'Amato also found that, beginning on July 20, 2005, Plaintiff had the same RFC as

before, but with the additional limitation that he required work which allowed him to miss

greater than two workdays per month due to the symptomatology of his severe migraines and the

after effects of his seizures (R. 22-23).  In so finding, the ALJ noted that the medical evidence

after that date generally supported that Plaintiff's impairments had worsened, and that Plaintiff's

allegations regarding his symptoms and limitations were generally credible (R. 23-24).  The ALJ

found that, based on the VE's testimony, Plaintiff was not capable of performing any past

relevant work since the allege onset date (R. 24).  Yet, prior to July 20, 2005, considering

Plaintiff's age, education, work experience, and RFC, there were a significant number of jobs in

the national economy that Plaintiff could have performed (R. 25).  Therefore, ALJ D'Amato

concluded that Plaintiff was not disabled until that date.  The ALJ further found that beginning

on July 20, 2005, considering Plaintiff's age, education, work experience, and RFC, there were

not a significant number of jobs in the national economy that Plaintiff could perform (R. 26).

Therefore, the ALJ concluded that Plaintiff became disabled on July 20, 2005, and continued to

be disabled as of the date of the decision.  The ALJ further concluded that Plaintiff's substance

abuse disorder was not a contributing factor material to the determination of disability.

II.     ANALYSIS

   A.     **Standard of Review**

In adopting federal court review of Social Security administrative decision, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry the burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than his past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant aspects.  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which Plaintiff can perform.  *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (a hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-6 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's

16

impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must

state with precision the physical and mental impairments of the claimant."); *Myers v.*

*Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir.

1975).

     **B.**    **Factual Analysis**

     In his motion for summary judgment, Plaintiff argues that he should be granted disability

benefits because substantial evidence did not support the ALJ's decision that Plaintiff was not

disabled between February 1, 1998, the alleged onset date, through March 31, 2002, the date last

insured (Dkt. #31, pp. 1-4).

     **1.**    *Plaintiff's Impairments*

     In order to qualify for disability benefits, Plaintiff initially bore the burden of proving

that he suffered from medically severe impairments that lasted or could be expected to last for a

continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A); 20 C.F.R. §§

404.1508, 404.1520(c), 404.1521; *Higgs v. Bowen*, 880 F.2d 860 (6th Cir. 1988).  Impairments

are "severe" if they significantly limit a claimant's ability to perform basic work activities.[3]  20

C.F.R. § 404.1521(b).

     An impairment qualifies as not severe when it does not affect the claimant's ability to do

basic work activities, regardless of age or vocational background.  *Bowen v. Yukert*, 482 U.S.

137, 152 (1987); *Higgs*, 880 F.2d at 862; *Salmi v. Sec'y of Health and Human Services*, 774 F.2d

---

     [3] Basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b).

685, 691 (6th Cir. 1985); 20 C.F.R. § 404.1521(a).  In the present case, ALJ D'Amato found that Plaintiff had "severe" impairments consisting of mood disorder, NOS, anxiety disorder, personality disorder, NOS, seizure disorder, and migraines secondary to a head injury.  The ALJ concluded, however, that none of the impairments were "severe" enough to meet or medically equal, either singly or in combination, one of the impairments in the Listing (R. 19).

Although Plaintiff does not raise a listing argument, give his *pro se* status, this Report will address this issue.  At step three of the sequential evaluation process, the ALJ reasonably found that Plaintiff's impairments, whether considered singly or in combination, did not meet or medically equal a listed impairment (R. 19).  The ALJ specifically noted that he considered the neurological listings 11.03 and 11.04, which were most applicable, based on the record evidence. As the ALJ noted, there was nothing in the record evidence about seizures until 2005, when Plaintiff's friends reported that Plaintiff had frequent seizures (R. 22, referring to R. 64, 77-78). Moreover, Plaintiff did not seek treatment for seizures or seizure-like activity until January 2006 (R. 21-22, referring to R. 234, 239).  Thus, to the extent that Plaintiff had seizures or seizure-like activity, there is no evidence in the record that these "spells" began until after his date last insured, and his conditions could not have met or equaled a listing prior to March 31, 2002.

Listing 11.04 concerns difficulties that occur more than three months after a head trauma, which appear in the medical record for the first time in 1992 (R. 122).  That listing, however, requires either ineffective speech or communication or a significant and persistent disorganization of motor function in two extremities.  Nothing in the medical record or Plaintiff's testimony suggest that he had difficulty with speech or communication as anticipated by the listing.  Further, the medical record prior to Plaintiff's date last insured does not mention

18

difficulty with motor function, let alone problems in two extremities, resulting in sustained disturbance of gross and dextrous movements, or gait and station, as required by the listing. The closest report of difficulty of motor function was a complaint about pain and spasms in Plaintiff's thighs (R. 164). The treating physician, Dr. Batah, merely made a note of the complaint and took no further diagnostic action. As late as March 2006, Plaintiff reported some numbing and tingling on his right thigh and, occasionally, in his left thigh (R. 234). Plaintiff also reported his hand shaking during his "spells," but none of these effects resulted in motor function difficulty as contemplated by the listings. Moreover, no treating or examining physician ever noted that Plaintiff had difficulty with gross and dextrous movements or with gait and station. Therefore, the ALJ did not err in finding that Plaintiff's impairments, either singly or in combination, did not meet or medically equal a listed impairment.

Plaintiff argues that the ALJ erred in concluding that he was not disabled because the ALJ ignored Plaintiff's Case Development Sheet which indicated Plaintiff had complained about seizures between 1998 and 2001 (Dkt. #24, p. 3, referring to R. 110). Plaintiff also argues that the ALJ erred by improperly discounting the pain he experiences from his headaches, as well as eyewitness accounts of Plaintiff's seizure symptoms (Dkt. #31, p. 1).

"Although required to develop the record fully and fairly, the ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. 2004) (*quoting Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). Contrary to Plaintiff's contention, the ALJ considered the record evidence and reasonably found that it did not support the claim that Plaintiff had been disabled under the meaning of the Act since 1998 (R. 21-22).

19

The ALJ noted that between the date of Plaintiff's accident in 1969 and the date last insured, there were very few medical records, and nowhere was there a mention of a seizure disorder nor a prescription for anti-seizure medication (R. 21).  Additionally, the medical records give little indication of the intensity, frequency and duration of Plaintiff's symptoms.  Where doctors' reports are silent regarding these factors, there is no severe impairment.  *Higgs*, 880 F.2d at 863.  Therefore, the ALJ's findings are supported by substantial evidence.

In regards to credibility, the ALJ is not required to accept a claimant's own testimony regarding allegations of the intensity, persistence and limiting effects of the alleged symptoms when such testimony is not supported by the record.  *See Gooch v. Sec'y of Health and Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  The ALJ must, however, do more than say the testimony is not credible based on generalities or merely recount the medical evidence and claimant's daily activities and then without analysis summarily conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain.  *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994).  In order for an ALJ to properly discredit a claimant's subjective testimony, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons.  SSR 96-7p.  ALJ D'Amato noted the differences between two eyewitness accounts of Plaintiff's seizures, and that Plaintiff did not seek treatment for seizures until 2006 (R. 22).  Moreover, there was substantial evidence in Plaintiff's medical records to discredit Plaintiff's testimony regarding the severity of his symptoms, including pain, which the ALJ mentioned (R. 21).  In addition to the fact that none of Plaintiff's medical records indicate he was at risk for seizures until March 31, 2006, between 1992 and 2002, Plaintiff sought treatment for severe headaches

only a handful of times, and was able to mitigate the pain with medication (R. 123, 128, 157-

166).   If a condition is controlled by medication, it is not disabling.  *See Hardaway v. Sec'y of*

*Health and Human Servs.*, 823 F.2d 922, 927 (6th Cir. 1987). Therefore it is recommended that

ALJ D'Amato's determination not be overturned on this ground.

2.    <strong><em>The ALJ's Hypothetical Question</em></strong>

Plaintiff could have argued that the ALJ erred by finding that, prior to July 20, 2005,

even though Plaintiff was unable to return to his past relevant work, there existed jobs in the

national economy which he could have performed, thus he was not disabled.  Plaintiff did not

make this argument, but given his *pro se* status, this Report will briefly address the issue.  "In

order to support a finding that you are not disabled . . . we are responsible for providing evidence

that demonstrates that other work exists in significant numbers in the national economy that you

can do, given your residual functional capacity and vocational factors."  20 C.F.R. §

404.1560(c)(2).  "Work exists in the national economy when there is a significant number of jobs

(in one or more occupations) having requirements which you are able to meet with your physical

or mental abilities and vocational qualifications."  20 C.F.R. § 404.1566(b).

Although ALJ D'Amato asked VE Castellana to consider a hypothetical person who

could only perform simple, unskilled work in an environment with stable temperatures, there was

no mention of Plaintiff's headaches (R. 331).  Plaintiff argues that his headaches were so severe

as to preclude all employment (Dkt. #31, p. 2).

The ALJ's hypothetical question did not specifically mention headaches as one of the

conditions the VE had to consider in the initial hypothetical question, because the ALJ is entitled

to determine what the claimant's impairments are, and he apparently discounted the frequency

21

and severity of Plaintiff's headaches prior to March 31, 2002, Plaintiff's date last insured.  The medical records indicate that Plaintiff felt much better when his headaches were treated with various medications (R. 123, 128, 157-166).  As noted above, if a condition is controlled by medication, it is not disabling.  Therefore, the ALJ's hypothetical was not flawed for failing to include a reference to pain caused by headaches.

### 3.   *Evidence Submitted to the Court*

In conjunction with his request for review of the ALJ's decision by the Court, Plaintiff presented additional evidence.  The evidence, which was not submitted to the Appeals Council, cannot be used to reverse the Commissioner's decision on appeal.  While the new evidence becomes part of the administrative record, it is the ALJ's decision that is then under federal court review, and the evidence cannot be used to reverse the decision, because it was not before the ALJ.  *Cotton*, 2 F.3d at 696, citing *Willis v. Sec'y of Health and Human Servs.*, 727 F.2d 551, 553-54 (6th Cir. 1984) (the record is closed at the administrative law judge level).  Where a party presents new evidence on appeal to the federal court for the first time, the Court can consider the evidence only to determine if a remand is appropriate under sentence six of 42 U.S.C. § 405(g) for further consideration of the evidence, but only if the party seeking remand shows that the new evidence is material.  In this case, Plaintiff has not provided this Court with an argument for a sentence six remand, but given his *pro se* status, this Report will address the issue.

Plaintiff has offered four pieces of evidence that must be analyzed under the sentence six framework: Kathleen Sapikowski's affidavit (Dkt. #24, pp. 6-7); Henry Ford Hospital neuropsychological assessment (Dkt. #24, pp. 23-26); William Beaumont Hospital operative records (Dkt. #24, pp. 27-40; and Henry Ford Hospital brain MRI report (Dkt. #31, p. 6).

22

Additional evidence is considered "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). The affidavit and records from Henry Ford Hospital meet this standard, because they were not in existence at the time of Plaintiff's hearing before the ALJ. The records from Beaumont Hospital, however, clearly do not meet the definition of "new" as they are dated between November 24, 1970, and April 24, 1973. Nor are the Beaumont records material, as they relate to tympanoplasty procedures that the Plaintiff underwent to repair damage to his ears shortly after his accident. Evidence is material if it would provide a basis for changing the ALJ's decision. *Sizemore v. Sec'y of Health and Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). The only medical record that indicates Plaintiff had a problem with his ears is from December 1998, when he was treated for an ear infection (R. 164). Plaintiff did not complain of either vision or hearing loss during his testimony on July 10, 2007 (R. 284-335). To the extent that Plaintiff is arguing that his ear operations in the early 1970's support his claim, it is significant that Plaintiff continued to work for a number of years after those operations. *Blacha v. Sec'y of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("[I]t is significant that [the claimant] continued to work . . . for two years after his accident."). Therefore, the Beaumont records would not have changed the ALJ's decision, and thus are not material.

The other three pieces of new evidence also fail the materiality test. Each of them post-dates Plaintiff's date last insured and the ALJ's decision. The affidavit is dated April 16, 2009, and the reports from Henry Ford Hospital are dated April 23 and June 14, 2008. At most, the Henry Ford records indicate that Plaintiff's condition has deteriorated over time, but the ALJ took that into account when he determined that Plaintiff was eligible for SSI beginning on July

23

20, 2005 (R. 23).  Evidence which reflects Plaintiff's deteriorated condition is not relevant because it does not indicate the point in time that the disability began.  *Sizemore*, 865 F.2d at 712.  Because this additional evidence is not material, remand pursuant to sentence six is not appropriate.  Rather, substantial evidence supports the ALJ's decision.

### III.    RECOMMENDATION

For the reasons stated above, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.  The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service or a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall

address specifically, and in the same order raised, each issue contained within the objections.

Dated: July 6, 2009                          s/Steven D. Pepe
Ann Arbor, Michigan                  United States Magistrate Judge